IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2003

## JAMES DISON  v.  STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Sevier County**
**No. 98-174-I     Ben W. Hooper II, Judge**

---

**No. E2003-00251-CCA-R3-PC**
**February 17, 2004**

---

Petitioner, James Dison, appeals from the trial court's denial of post-conviction relief. Petitioner was convicted for rape of a child and sentenced to twenty-five years confinement. This Court affirmed Petitioner's conviction and sentence on direct appeal. *State v. James Dison*, No. 03-C01-9602-CC-00051, 1997 WL 36844, 1997 Tenn. Crim. App. LEXIS 93 (Tenn. Crim. App. at Knoxville, January 31, 1997), *perm. to app. denied* (Tenn. 1997). Petitioner filed a *pro se* petition for post-conviction relief. Petitioner was appointed counsel and subsequently filed an amended petition for post-conviction relief, alleging that he received ineffective assistance of counsel at trial. Following an evidentiary hearing, the trial court denied the petition. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

James W. Greenlee, Sevierville, Tennessee (on appeal); and Keith E. Haas, Sevierville, Tennessee (at trial), for the appellant, James Dison.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; Steven Hawkins, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**Factual Background**

The victim is Petitioner's sister, who was less than thirteen years of age at the time of the offense. She lived with her mother, father, and three brothers in Sevierville, Tennessee. This Court summarized the facts underlying Petitioner's conviction on direct appeal as follows:

On the occasion of the charged sexual abuse, AD was at home with her brothers, Jimmy [the appellant] and Chris. On this day, AD's father was not working due to an injury he had suffered at work. However, at the time of the rape, he was driving AD's mother to work. AD and Chris were in the living room, watching television, and Jimmy was in their parents' bedroom. Jimmy asked AD to come to their parents' room. When she entered the room, the appellant shut and blockaded the door. The appellant then moved onto the bed, underneath the blankets. He instructed AD to join him on the bed and proceeded to force AD to perform oral sex on him. At trial, AD recounted, "White stuff came out of his wiener."

Following oral intercourse, AD went to the bathroom and rinsed out her mouth. While she was in the bathroom, her brother Chris entered the room. He asked her what she was spitting into the sink. She informed him that it was "come," and described what had happened. The appellant then directed AD to return to their parents' room. AD explained that she returned to the room because she was afraid of the appellant. In the room, the appellant told AD to remove her clothing and, again, join him on the bed. AD testified, "Then he stuck his weiner up in me. . . [and] told me to go up and down." At some point, AD asked the appellant to stop, but the appellant did not respond. AD stated that the penile intercourse was painful, and she cried.

The appellant subsequently informed AD that if she reported his actions, "he would stick it in all the way." Nevertheless, AD attempted to tell her mother what the appellant had done, but her mother did not believe her. She also told her babysitter, Tanya Humphrey, what had happened. Apparently, Ms. Humphrey reported the incident to the Department of Human Services (DHS), as soon thereafter, AD was interviewed by DHS and, again, recounted her experience. She was examined by Dr. Phillip Stanley, in whom she also confided.

On cross-examination, AD testified that on Fridays, Saturdays and some Sundays, she would stay at Tanya Humphrey's home while her parents worked at a card shop in a local mall. Moreover, during the week, the appellant would occasionally visit his girlfriend, leaving AD with Ms. Humphrey for several hours. Occasionally, AD spent the night at Ms. Humphrey's residence. Ms. Humphrey lived with her daughter and her boyfriend. Her son, who was approximately twelve or thirteen years old, would also visit.

AD additionally revealed that, when AD was feeling ill, Ms. Humphrey would give her medicine that she had obtained in Knoxville. According to AD, "[s]ome of [the pills] were white and some of them were yellow and red." Ms. Humphrey also gave AD a "very, very, very dark pink" substance that she referred to as Pepto-Bismol. This substance was not contained in a Pepto-Bismol bottle and

made AD feel drowsy. After ingesting the medicine, AD would sleep for three or four hours. When she awoke, AD would discover that her underwear had been removed or changed. AD denied that anybody, to her knowledge, had sexually molested her at Ms. Humphrey's home. Finally, AD testified that, after she informed Ms. Humphrey about her brother's actions, the babysitter told AD that her father had sexually molested her when she was a child. However, AD denied that Tanya ever told her what to say when interviewed by DHS.

Chris Dison also testified. Chris recalled the occasion recounted by his sister, AD. He testified that, on that occasion, he, AD, and their oldest brother Jimmy were at home. Jimmy was supervising both Chris and AD. Jimmy asked AD to accompany him into their parents' room and instructed Chris to remain in the living room watching television. Chris subsequently heard his sister crying and attempted to enter the bedroom. However, according to Chris, something was blocking the door. He returned to the living room and continued watching television. He then heard his sister exit the bedroom and enter the bathroom. He went to the bathroom and observed AD "spitting out white stuff, gooey white stuff." When he asked AD what had happened, AD responded that the appellant "was having sex with her and made her suck his penis." When Chris confronted his brother, the appellant threatened to hit Chris if he told anyone what the appellant had done. Nevertheless, Chris attempted to tell his mother what had happened. His mother did not believe him. He then told his father. However, DHS was only contacted when AD informed Ms. Humphrey of the incident.

On cross-examination, Chris testified that, during the summer of 1994, the appellant was rarely alone with Chris and AD. He also confirmed that, occasionally, Ms. Humphrey babysat both him and AD and that she gave both him and AD pills which would cause them to sleep. Chris affirmed that Ms. Humphrey recounted to the children in some detail her experience of sexual abuse by her father.

Dr. Philip B. Stanley, a pediatrician, testified that, on August 3, 1994, he examined the victim, AD. He stated that he "performed a full physical exam on [AD] and during that physical exam, particularly dealing with her genital area, [he] noticed that she had absence of her hymen and a scar tissue located in the hymenal vault area." Dr. Stanley opined that only sexual intercourse could have caused the absence of the hymen. Similarly, the scar tissue indicated "[trauma] meaning from a penis being inserted in [the hymenal vault area]." Dr. Stanley stated that the victim had informed him that the appellant, Jimmy Dison, had engaged in intercourse with her. AD also informed the doctor that "she had to perform oral sex for [the appellant] on numerous occasions."

The appellant testified. He stated that, during July of 1994, he was employed at the Pizza Hut in Sevierville. He worked everyday, except Wednesday and Sunday, from 5:00 p.m. until between 1:00 a.m. and 2:30 a.m. in the morning. On his days off, he would visit his girlfriend. He could not recall being at home alone with AD and Chris during the month of July, 1994, as, that summer, his father did not work during the week. Additionally, on weekends, while his father and mother worked at the card shop, AD and Chris stayed with the babysitter, Tanya Humphrey. The appellant conceded that he did occasionally babysit his siblings, but he denied ever molesting his sister.

Jeremy Dison testified. He stated that he could only recall one occasion in July of 1994 on which the appellant was at home alone with him, Chris, and AD. According to Jeremy, on that day, the appellant slept all morning until their mother returned home. With respect to Ms. Humphrey, Jeremy testified that he had observed her administering medication to Chris and AD while babysitting the Dison children: "They were various different pills. There were big blue pills the size of quarters and there was white pills looked like horse pills; there was Valium, I know she gave them Valium, but a whole slew kinds of pills."

Jeremy further testified that Ms. Humphrey was a recovering heroin addict and traveled to Knoxville every other day to obtain Methadone. She kept the Methadone, which was orange, in the refrigerator at her home. Jeremy asserted that she gave AD and Chris Methadone when they experienced headaches or stomachaches. Jeremy testified that he accompanied Ms. Humphrey to Knoxville several times. During these trips, AD and Chris were left at Ms. Humphrey's home, either alone or in the care of Ms. Humphrey's daughter.

Jeremy further asserted that, following the initiation of an investigation by DHS, AD indicated to her family that she had been molested by someone other than her brother. AD also stated that she had dreamed that her brother had molested her. On cross-examination, Jeremy conceded that, when AD made these statements, he, his grandmother, and his parents were attempting to tape AD's statements in order to assist the appellant's defense. Moreover, at the time of these statements, the appellant was in the yard outside the Dison home. Jeremy admitted that neither he nor any other member of his family informed DHS of AD's statements, but alleged that DHS refused to schedule an appointment with the appellant's family. He did testify that, when interviewed by Angela Johnson, from DHS, he informed Ms. Johnson that AD had told her family various, different stories concerning her experience of sexual abuse. However, a transcript of the interview did not support this testimony. Moreover, Jeremy testified that he did not mention his allegations concerning Ms. Humphrey to Ms. Johnson. Finally, during the interview with Ms. Johnson, Jeremy suggested that his sister's allegations were the result of watching cable television.

Cora Stanton, the appellant's grandmother testified on behalf of the appellant. She stated that she had known the appellant his entire life and that the appellant lived with her for a time following his sister's allegations. She asserted that the appellant is "more honest than most." She further testified:

> Well, we were sitting on the couch one day, Jeremy and [AD] and myself. And I said [AD], did Jimmy really do that. She said I don't think so. I dreamed. I said well, the dream was not the same thing, [AD]. She said, I know, but Tanya give me a pill, I went to sleep. I dreamed somebody was doing something to me and when I woke up I didn't have any panties on. Tanya said it was Jimmy.

Ms. Stanton conceded that, after the initiation of an investigation, in violation of a court order, she brought the appellant two times to the Dison home where AD and Chris were staying. She asserted, however, that the appellant remained outside on both occasions. The record reflects that, due in part to these violations, AD and Chris were removed from the Dison home.

Tracy Proffitt, a DHS foster care worker assigned to AD and Chris, testified that these children currently reside at the Church of God Home for Children. She stated that defense counsel contacted her, attempting to schedule an interview with the children. After speaking with her supervisor, she informed defense counsel that he would have to speak with DHS Legal Services. Lana Riddick, the DHS Social Service Supervisor for Sevier County, testified that she decided to refuse defense counsel access to the children. She was aware that the children had already been interviewed by the Public Defender's office. She was also aware that the children had testified in juvenile court and had been cross-examined by an attorney from the Public Defender's office.

Angel Johnson, a DHS Social Counselor, testified that she was the primary investigator in this case and conducted the initial interview of the victim. She testified that, in interviewing AD, she did not ask leading questions. Rather, AD first brought up her brother's name and the topic of "bad touches." Ms. Johnson also spoke with Chris Dison. Again, Chris first broached the topic of his sister's sexual abuse.

*Dison*, 1997 WL 36844, at *1-5.

**Post-Conviction Hearing**

Public Defender Ed Miller represented Petitioner at trial and in the direct appeal. Mr. Miller had represented criminal defendants in jury trials in at least five prior child sexual abuse cases. Mr. Miller met with Petitioner on at least five occasions prior to trial. Mr. Miller did not independently

recall any specific facts about the trial. Mr. Miller did not specifically recall discussing the possible range of punishment with Petitioner, however, he testified, he generally discusses the range of punishment during the first meeting with a client. Mr. Miller did not recall receiving any plea offers from the State in this case. The State introduced, as an exhibit at the hearing, a letter written by Mr. Miller to Petitioner, requesting that Petitioner contact Mr. Miller in order to schedule a meeting to discuss Petitioner's case.

Prior to trial, Mr. Miller filed a "Motion for Access to Witnesses," requesting that he be allowed to interview the victim and her brother Chris Dison, who were in the custody of the Department of Human Services. The motion was denied as too late because a hearing was not conducted prior to trial. On direct appeal, however, this Court concluded that the witnesses could not be compelled to submit to an interview by defense counsel. *Dison*, 1997 WL 36844, at \*12-13. Mr. Miller subpoenaed the Disons' babysitter, Tanya Humphrey, but she was unavailable as a witness at trial. Mr. Miller did not cross-examine Dr. Stanley because his medical examination revealed extensive sexual activity and scarring to the victim, rather than a single act of penetration. Mr. Miller received by fax Petitioner's employment records on the second day of Petitioner's two-day trial. Those records, which were admitted as an exhibit at the post-conviction hearing, showed that Petitioner's last day of work at Pizza Hut was on June 14, 1994, prior to date of the alleged offense. Mr. Miller did not call Petitioner's parents to testify at trial.

Linda and Curtis Dison, Petitioner's mother and father, both testified at the post-conviction hearing. Petitioner's parents testified that Dennis Campbell represented Petitioner before his case was transferred from juvenile court. Ms. Dison testified that during Mr. Campbell's representation, the State made a plea offer of six months in psychiatric care evaluation and a maximum of six years to be served in confinement. Petitioner rejected the plea offer because, Ms. Dison testified, Mr. Campbell advised Petitioner that the State did not have a strong case against Petitioner. Ms. Dison also testified that Petitioner was advised that the possible range of punishment was ten to fifteen years. Ms. Dison testified that she did not learn that Petitioner could receive a sentence of fifteen to twenty-five years to be served at 100 percent until the day of sentencing. Ms. Dison testified that Mr. Miller began representing Petitioner two weeks prior to trial, after Petitioner's case was transferred from juvenile court. Mr. Dison testified at the hearing that he first met with Mr. Miller only a few days before Petitioner's trial was set to begin. The record shows, however, that the trial was continued from March, 1995 until August, 1995.

Ms. Dison testified at the post-conviction hearing that, prior to trial, Petitioner was on bond and living with his grandmother, Cora Stanton. The victim and Chris Dison remained in the custody of their parents until DHS removed them from the family home. Mr. and Ms. Dison and Ms. Stanton violated a court order to keep Petitioner away from his siblings, including the victim. Following that incident, DHS removed the victim and her brother Chris from the family home. The Disons and Ms. Stanton also attempted to secretly tape record the victim. Ms. Dison told Angela Johnson, a DHS worker, that her husband had directed the victim and Chris not to tell the truth to DHS workers. Ms. Dison also told Ms. Johnson that the victim had told her that Petitioner had "put his fingers in her and had her do oral sex to him." Ms. Dison testified that Petitioner had said about the victim that

-6-

she would not lie.  Petitioner had also stated, "I don't know if I did or I didn't do it."  Ms. Dison testified that Petitioner was suffering from severe migraines at the time of the offense.

Ms. Dison also testified at the hearing that she advised the District Attorney's office of her suspicions regarding the babysitter, Tanya Humphrey, prior to trial.  Ms. Dison learned from her son Jeremy that Ms. Humphrey had taken him with her to Knoxville to purchase drugs on prior occasions.  Ms. Dison testified that Petitioner babysat his brothers and sisters when Tanya was unavailable to babysit.  Mr. Dison testified that he stayed home with his children from March, 1994, until September, 1994, due to a work-related injury.  Mr. Dison still drove his wife to work, and Petitioner was left alone with his siblings.  When Mr. Dison learned of the allegations, he "didn't believe [Petitioner] would do it."  The Disons both testified at the hearing that they did not testify at Petitioner's trial because Mr. Miller advised them that their testimony, as the parents of both the defendant and the victim, would not be credible to a jury and would be harmful to Petitioner's case.

Petitioner testified at the post-conviction hearing.  He testified that Dennis Campbell represented him during the juvenile court proceedings.  Petitioner met with Mr. Campbell several times before the transfer hearing.  Petitioner's parents were also present for at least two of those meetings.  Petitioner testified that, while Mr. Campbell was representing him, he received a plea offer from the State.  Petitioner testified that he understood that the maximum sentence he could receive if convicted would not exceed the sentence that he was offered under the plea agreement.  Petitioner therefore rejected the plea offer.  Petitioner did not learn that, if convicted, he could be sentenced to fifteen to twenty-five years to be served at 100 percent until after the plea was rejected.  Petitioner testified that he made several attempts to contact Mr. Miller and received no response.  Petitioner testified that he worked at Pizza Hut during the month of the alleged offense.  Petitioner also testified that the victim and Chris were sometimes left alone in his care during the month of July, 1994.  Petitioner testified that Mr. Miller did not interview Jennifer Myers, Petitioner's girlfriend at the time of the offense, as a potential witness.  Petitioner testified at the hearing that, if called as a witness at trial, Ms. Myers could have testified that her parents picked up Petitioner in the mornings, and he stayed at their house until he went to work.  Petitioner testified, however, that there were times when he was alone with his younger siblings.  Petitioner did not specifically name any other witnesses that defense counsel should have called to testify at his trial.

Dennis Campbell worked in the Public Defender's office from 1990 until 2000.  He represented Petitioner in juvenile court on the instant charge.  Mr. Campbell testified that he discussed the possible range of punishment with Petitioner.  Mr. Campbell advised Petitioner and his parents that the range of possible sentences was fifteen to twenty-five years.  Mr. Campbell interviewed the victim and her brother Chris Dison.  Mr. Campbell attempted to contact the Disons' babysitter numerous times, but was unable to talk with her.  Mr. Campbell met with Petitioner numerous times and investigated any possible alibis, including Petitioner's place of employment during the alleged offense.  Mr. Campbell advised Petitioner that there was "substantial evidence" of his guilt in this case, but Petitioner maintained his innocence.  Mr. Campbell asked Petitioner if he could have committed the offense and forgotten due to his migraine headaches.  When

Petitioner's case was transferred from juvenile court, Mr. Miller took over Petitioner's representation.

**Ineffective Assistance of Counsel Claim**

The petition for post-conviction relief and the amended petition claim that counsel was ineffective for the following reasons:

1. Counsel did not confer with his client as often as necessary to elicit matters of defense. Mr. Miller only conferred with petitioner on two or three occasions and this is not enough to provide a proper defense on this type of case.

2. Counsel did not do adequate research, both factual and legal.

3. Counsel did not conduct adequate investigation.

4. Counsel did not interview all potential witnesses.

5. Counsel did not follow through with pretrial motions as he should, thereby, causing important grounds to be waived on appeal.

6. Counsel was not an expert at defending child sex abuse cases and not qualified to make a proper defense of petitioner. He should have requested assistance from an attorney who is experienced in these type of cases.

7. Following the court's denial of a mistrial on other crimes evidence, counsel failed to ask for curative instructions causing this ground to be waived on appeal, thereby prejudicing petitioner.

8. Counsel did not pursue the motion to review the records of the Department of Human Services causing the motion to be denied. This caused this ground to be declared waived by the Court of Criminal Appeals.

9. Counsel did not fully advise the Petitioner of the range of punishment he was facing at the outset of his case.

10. Counsel did not present offers of settlement through plea bargain(s) to the Petitioner in a manner that fully advised the Petitioner of the consequences of said offers and the proper range of punishment he was actually facing.

11. Counsel failed to call exculpatory witnesses that were in the Courthouse, available to testify, that shows that Counsel did not adequately investigate, prepare

or defend the Petitioner in a manner consistent with the standards of effective assistance of counsel.

12. Counsel failed to object to Dr. Stanley's testimony as an expert witness. Mr. Miller stipulated that Dr. Stanley was an expert as a *pediatrician*, not as an OB/GYN physician. The primary purpose for calling Dr. Stanley was to introduce the evidence of the alleged victim's absence of a hymen. This is a OB/GYN question, not a pediatric question and Mr. Miller did not object and did not cross-examine this witness **at all**. Dr. Stanley, in response to a question by the State, answered that the only way that there could be an absence of a hymen in this child is sexual intercourse. He was not certified as an expert in this area and trial counsel should have objected.

(Emphasis in original).

At the conclusion of the hearing, the post-conviction court orally concluded that Petitioner had not established that defense counsel's performance was deficient. The trial court found that "there was sufficient contact between Mr. Miller and his client and witnesses and family members." The court also found that Petitioner had not established that defense counsel did not confer with Petitioner as often as necessary or that defense counsel did not adequately research Petitioner's case. The court stated, "there's been no proof here to support that allegation [of inadequate research] at all." The trial court concluded that Petitioner had failed to show prejudice as a result of defense counsel's alleged failure to interview witnesses. The trial court further concluded that Petitioner was not prejudiced by defense counsel's alleged failure to pursue the motion to allow access to the victim and her brother. The trial court found that there was nothing in the record to support the allegation that defense counsel was not an expert in defending child sex abuse cases and was not qualified to make a proper defense. The trial court concluded that Petitioner was not prejudiced by defense counsel's failure to request a curative instruction following the trial court's denial of a mistrial based on the erroneous admission of other crimes evidence because in the direct appeal, the Court of Criminal Appeals concluded that the error was harmless. *See Dison*, 1997 WL 36844, at *10. The trial court also concluded that Petitioner failed to show prejudice as a result of defense counsel's alleged failure to review DHS records because there was "no showing [at the post-conviction hearing] of what could possibly be in those records that would be helpful to [Petitioner]." The court found that Petitioner had been fully advised of the range of punishment and that defense counsel presented plea offers to Petitioner, but that Petitioner rejected any offers to plead because, the trial court stated, "it's quite clear, too, that you [Petitioner] were not interested in any plea negotiations or trying to resolve this, you took the position that you were not guilty. . . ." The court found that Dr. Stanley, a pediatrician, was qualified to give expert testimony regarding the sexual abuse of a child. Finally, the trial court found that if Petitioner's parents had testified at trial, "it certainly probably would not have changed the result in this trial."

Petitioner does not specifically allege error in the trial court's ruling. In his brief, Petitioner makes the general assertion that he was prejudiced by defense counsel's deficient performance.

Petitioner argues that defense counsel failed to consult with Petitioner, was unprepared, and did not provide a zealous representation of Petitioner.

The trial judge's findings of fact on post-conviction hearings are conclusive on appeal unless the evidence preponderates otherwise. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, this Court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the trial judge. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the trial court, not this Court. *Burns*, 6 S.W.3d at 461. The burden of establishing that the evidence preponderates otherwise is on petitioner. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). The trial court's conclusions of law, however, are reviewed under a purely *de novo* standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

We review a claim of ineffective assistance of counsel under the standards of *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975), and *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the defendant so as to deprive him of a fair trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996); *Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the court need not address the components in any particular order or even address both if one is insufficient. *Goad*, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

As to the allegation that defense counsel did not confer with Petitioner as often as necessary, Petitioner himself testified at the post-conviction hearing that he met with Assistant Public Defender Dennis Campbell several times before his case was transferred from juvenile court. Public Defender Ed Miller testified that he met with Petitioner on at least five occasions prior to trial. Mr. Miller also wrote a letter to Petitioner, requesting that Petitioner contact him to schedule a meeting to discuss Petitioner's case. Petitioner has failed to establish that counsel's performance was deficient in this regard. As to the allegation that counsel did not conduct adequate research and investigation, Petitioner has also failed to establish that counsel's performance was deficient.

Petitioner has not shown that he was prejudiced by defense counsel's alleged failure to interview potential witnesses. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner testified at the post-conviction hearing as to what his former girlfriend, Jennifer Myers, might have testified to at trial. However, Ms. Myers did not testify at the hearing. Petitioner has failed to prove prejudice. Petitioner has not alleged any other potential witnesses whom defense counsel should have interviewed or presented at trial.

In the direct appeal in this case, this Court addressed the issues of: (1) whether the trial court erroneously declined to declare a mistrial following the introduction of other crimes evidence; (2) whether the trial court should have dismissed the indictment, or alternatively, granted a continuance, based on defense counsel's inability to interview the victim and her brother Chris Dison; and (3) whether defense counsel should have been granted access to DHS records in possession of the State. In his petition for post-conviction relief, Petitioner argues that defense counsel was ineffective for causing those issues to be waived on appeal. In the opinion of this Court, however, we addressed those issues and concluded that although defense counsel waived each of the issues, the errors in the trial court, if any, were harmless. With respect to those issues, we held: (1) the evidence of other sex crimes was admissible under the supreme court's holding in *State v. Rickman*, 876 S.W.2d 824, 829 (Tenn. 1994), and although defense counsel should have requested a curative instruction following the trial court's denial of a mistrial based on Dr. Stanley's testimony regarding other incidents of oral intercourse, the admission of that testimony was harmless error, *Dison*, 1997 WL 36844, at \*10; (2) although defense counsel waived this issue by not having brought the motion to access the child witnesses in the custody of DHS to the attention of the trial court prior to trial, prospective witnesses have the right to refuse to be interviewed. Moreover, Defendant failed to show how he was prejudiced by the trial court's denial of his motion, and therefore, any error, if any, was harmless, *Id*. at \*12-13; and (3) the prosecutor indicated to the trial court that the DHS records contained no exculpatory evidence, and Defendant failed to demonstrate otherwise, *Id*. at 14-15. We conclude that Petitioner has failed to show in this post-conviction proceeding how, if at all, he was prejudiced by defense counsel's waiver of those issues.

Additionally, Petitioner argues that counsel was ineffective for failing to advise Petitioner of the possible range of punishment and to present offers of settlement to Petitioner. The record indicates that Petitioner was advised of both the possible sentences and any plea offers made by the State. At the post-conviction hearing, Dennis Campbell, who represented Petitioner in juvenile court, testified that he discussed the range of possible sentences with Petitioner and his parents. Petitioner and his parents testified at the post-conviction hearing that they were all advised of a plea offer made by the State prior to trial, but their testimony was unclear as to the sentence under that plea offer. Mr. Campbell testified that Petitioner rejected the offer because he maintained that he did not commit the offense, even though Mr. Campbell advised Petitioner that there was "substantial evidence" of his guilt. Petitioner failed to establish that defense counsel's performance was deficient.

Finally, the post-conviction petition alleges that defense counsel was ineffective for stipulating that Dr. Stanley, a pediatrician, was an expert qualified to testify as to the victim's injuries and for not cross-examining Dr. Stanley at trial. The post-conviction court concluded that Dr. Stanley, who examined the child victim in this case and testified as to the absence of a hymen and the presence of scar tissue in her genital area, was qualified to give his expert opinion. There is no evidence to show otherwise. Also, Mr. Miller testified at the post-conviction hearing that Dr. Stanley's examination revealed extensive sexual activity and scarring to the victim. Mr. Miller therefore determined that cross-examination of Dr. Stanley would not reveal any evidence that would benefit Petitioner's case. Petitioner has failed to prove a deficiency in counsel's performance.

**CONCLUSION**

The judgment of the trial court is affirmed.

_____

THOMAS T. WOODALL, JUDGE